UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KENNETH C. WHITFIELD,

    Petitioner,

v.                                              CASE NO. 8:15-cv-1298-T-23AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS and ATTORNEY
GENERAL, STATE OF FLORIDA,

    Respondents.
_____/

**ORDER**

On November 8, 2006, a man shot Daniel Tatum while Tatum and several friends played dominoes outside the Bradenton home of Fairey Lynah, a relative of Tatum. Flown by helicopter to Bayfront Medical Center, Tatum survived the shot and recovered after a protracted hospital stay. The State of Florida charged Kenneth Whitfield with attempted murder in the first degree, and in 2007 a jury convicted Whitfield. The presiding judge sentenced Whitfield to a term of forty years, which includes a minimum mandatory term of twenty-five years based on Whitfield's criminal history. In both the direct appeal and the state-court collateral challenge to the conviction, the Second District Court of Appeal affirmed *per curiam*.[1] Whitfield

---

[1] Because the Second District Court of Appeal affirmed without a written opinion, a review under Section 2254 "looks through" the per-curiam affirmances and examines the trial court's disposition both of Whitfield's Rule 3.850 motion and of several objections and motions at trial. *Wilson v. Sellers*, 138 S. Ct. 1188 (2018) (holding that a review under Section 2254 requires "look[ing] through" an unexplained state-court decision to the "last related state-court decision that [] provide[s] a relevant rationale" and presuming that the reviewing state court adopted the same reasoning).

petitions (Doc. 4) under Section 2254 for a writ of habeas corpus and claims violations of the Fifth, Sixth, and Fourteenth Amendments.

## THE TRIAL

At trial, Tatum testified that he knew Whitfield because Whitfield dated a relative of Tatum's wife. Tatum, who owns a moving company affiliated with Spirit Movers, hired Whitfield as an employee, and Tatum identified no problem with Whitfield's job performance. (Tr. Trans. at 239) In fact, Tatum recommended Whitfield to Spirit Movers, and the corporate parent hired Whitfield.

But testimony revealed several strains in Tatum's relation with Whitfield. Tatum testified that he confronted Whitfield at a Super Bowl party after Whitfield purportedly mistreated a woman related to Tatum's wife. (Tr. Trans. at 207–08) Describing the incident, Tatum testified at one point that Whitfield "supposedly" possessed a gun at the party. The presiding judge promptly instructed the jury to disregard the testimony about Whitfield's supposedly possessing a gun at the party. (Tr. Trans. at 252)

Tatum testified to two more tensions between Whitfield and him. At a barbecue one day, Whitfield reportedly punched another man, and Tatum purportedly told Whitfield that he "was dead wrong" for punching the man. (Tr. Trans. at 252) Also, Tatum testified that the police inquired with Tatum about Whitfield's whereabouts, and Tatum told the police about Whitfield's employment with Spirit Movers. According to Tatum's testimony at trial, Whitfield reportedly

lost his job because he stopped attending work, which happened because Whitfield thought the police "were looking for him." (Tr. Trans. at 208) Whitfield moved for a mistrial based on Tatum's testimony that Whitfield thought the police "were looking for" Whitfield, but the trial judge denied the motion after observing that Tatum never said the police sought to arrest Whitfield at that moment and never said the police suspected Whitfield of a crime at that time. (Tr. Trans. at 210–15) In several follow-up questions, the state elicited testimony from Tatum that the police inquiry about Whitfield's whereabouts had no connection to the incident at the Super Bowl party. (Tr. Trans. at 225) Based on the two confrontations and Whitfield's loss of his job, Tatum believed that Whitfield had a "beef" with Tatum.

Tatum testified that, while playing dominoes and drinking beer with friends in the yard or driveway outside Lynah's house, Tatum saw Whitfield walking toward him. (Tr. Trans. at 243) After he saw Whitfield reach into his pants, Tatum turned to run and heard a shot, which struck him. (Tr. Trans. at 243) Tatum, who testified that he ran inside the house and barricaded himself in a back room, said that he heard two or three more shots after he entered the house. Although testifying that he saw Whitfield approach the house immediately before the shooting, Tatum said that he never saw Whitfield with a weapon. (Tr. Trans. at 243)

The location of Tatum's injury was featured prominently at trial. Whitfield attempted to impeach Tatum based on Tatum's purportedly inconsistent statements about the location of the bullet; Whitfield argued that Tatum alternatively claimed an

- 3 -

injury to his back, butt, and chest.  (For example, Tr. Trans. at 246)  The parties stipulated to several facts about the injury, including that the bullet penetrated Tatum's front beneath his left nipple line, traveled laterally, and exited Tatum's back on the right side.  Also, the parties stipulated that the bullet's entrance and exit were "consistent with" Tatum's turning during the shooting.  In closing, Whitfield assailed Tatum's credibility partly because someone with an entry wound in the chest presumably faced his attacker.  Whitfield reminded the jury that Tatum testified that he did not see Whitfield pull the trigger.

Although differing in some details, other witnesses corroborated Tatum's account.  Two witnesses, Tarrell Boynton and Fairey Lynah, testified to seeing Whitfield approach the house and fire at Tatum. (Tr. Trans. at 260, 270, 284–86)  A neighbor, Bernard Travis, testified that he saw Whitfield approach Tatum's house immediately before the shooting, although he never saw Whitfield pull the trigger.  Several witnesses testified to seeing Whitfield exit (before the shooting) or enter (after the shooting) a "beige-looking" vehicle.  Another witness, Carradine Allen, testified that she saw Whitfield driving toward the house several minutes before the shooting.  (Tr. Trans. at 345)  Allen confirmed to police that a vehicle abandoned in the yard of a nearby house matched the vehicle that Allen saw Whitfield driving immediately before the shooting.  (Tr. Trans. at 346–47)

A detective testified to recovering the vehicle, a "beige" or "pewter-looking" Dodge Neon, abandoned in the yard of a house blocks from the shooting.  Jimmy

Lee Boyd, who resided in the house and who knew Whitfield from high school, testified that he was cleaning his barbecue grill when the vehicle careened into the yard. (Tr. Trans. at 513–16) According to Boyd, the driver jumped out of the vehicle, smiled — his gold teeth shone brightly, but Whitfield has no gold teeth — and ran away. (Tr. Trans. at 513–16 and 518) Boyd testified that the driver was not Whitfield and that he did not know the driver. On cross-examination, Boyd testified that he never asked who owned the car, who the driver was, why the driver parked erratically in a stranger's front yard, or whether the driver would move the car.[2] (Tr. Trans. at 516–17)

**DISCUSSION**

Under Section 2254(d)(1), a federal court can grant habeas relief only if the state-court proceeding resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law" as announced by the Supreme Court. Whitfield claims half a dozen constitutional violations. First, Whitfield claims a denial of due process under the Fourteenth Amendment based on three purportedly prejudicial statements: Tatum's testimony that Whitfield stopped attending work at Spirit Movers because "he thought the police were looking for him," a statement that Whitfield turned himself into the police eight days after the

---

[2] A fingerprint expert testified that several prints (both finger and palm) on the exterior driver's door matched Whitfield. The car's owner testified that Whitfield had dated her daughter at the time of the incident. (Tr. Trans. at 339)

shooting, and Tatum's statement about Whitfield supposedly possessing a gun at the Super Bowl party.

The writ of habeas corpus remedies a detention that violates a federal constitutional right, but the writ ordinarily provides no relief to a prisoner who protests an adverse evidentiary ruling under state law. *Estelle v. McGuire*, 502 U.S. 62 (1991); *Woods v. Estelle*, 547 F.2d 269 (5th Cir. 1977). To establish a due process violation based on an erroneous evidentiary ruling, the petitioner must show that the improper or inadmissible evidence rendered the trial "fundamentally" unfair. In other words, the evidence — viewed in light of the trial as a whole — must have "so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72 (citations omitted). Considered separately or cumulatively, these three statements produced no "fundamentally unfair" trial that violated Whitfield's right to due process.[3]

Second, Whitfield claims a denial of due process under the Fourteenth Amendment based on a comment by the State Attorney during the closing argument. Responding to Whitfield's assertion that the someone other than Whitfield might have driven the beige car the night of the incident, the State Attorney said to the jury that "you would hear about it" if "the state couldn't connect the petitioner to" the car. (Tr. Trans. at 594) Whitfield contends that this statement tacitly shifted the burden of proof to Whitfield. In this circumstance, a single oblique comment about

---

[3] This result obtains whether the state-court resolution of the claims is *de novo* or in accord with the deference prescribed by Section 2254.

Whitfield's not presenting testimony or evidence about another driver establishes no due-process violation. In any event, the presiding judge instructed the jury that the State bears the burden of proving the charge beyond a reasonable doubt,[4] and the jury presumptively followed that instruction. *See Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987).

Third, Whitfield complains about several other comments in the State Attorney's closing argument. The State Attorney said that little or no evidence supported Whitfield's "phantom shooter" argument. (Tr. Trans. at 584–87) Also, the State Attorney suggested to the jury that, if a co-worker of a juror committed a crime in front of the juror, the juror could easily identify the co-worker. Additionally, Whitfield protests the State Attorney's thanking the jurors for their time and attention. Finally, Whitfield complains about the State Attorney's comment that "all of the witnesses" identified Whitfield as the shooter. (In fact, some witnesses, such as a paramedic, did not identify Whitfield — or anyone else — as the shooter, but the eyewitnesses uniformly identified Whitfield as the shooter or spotted Whitfield approaching Lynah's house immediately before the shooting.) Considered separately or cumulatively, these remarks in the State Attorney's closing argument

---

[4] Tr. Trans. at 608 ("[T]he State must prove the following three elements beyond a reasonable doubt . . ."); Tr. Trans. at 612 ("The defendant is not required to present evidence or prove anything.").

establish no violation of Whitfield's right to due process or of any other constitutional right.[5]

Fourth, Whitfield claims ineffective assistance of counsel and bases the claim on counsel's decision to stipulate to the location of Tatum's injury. To prevail on an ineffective-assistance claim, a petitioner must show both deficient performance by counsel and consequent prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* commands deference to an attorney's strategic decision; only if the counsel's decision falls outside the "wide range of reasonable professional assistance" might the claim succeed. Even if a petitioner shows that counsel deviated from the "wide range" of acceptable conduct, a petitioner's claim succeeds only if the petitioner shows a "reasonable probability" that the "result of the proceeding would have been different" but for "counsel's unprofessional errors." A reasonable probability means a probability "sufficient to undermine confidence in the outcome."

Additionally, Whitfield's custody results from the judgment of a Florida state court. Under Section 2254(d)(1), a federal court may grant habeas relief only if the state-court proceeding resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law" as announced by the Supreme Court. Under Section 2254(e)(1), a state court's finding of fact is presumed

---

[5] Whitfield claims that the State Attorney commented in the closing argument about Whitfield's invocation of the right against self-incrimination. (Doc. 4 at 11) Whitfield failed to exhaust this claim in state court, but even if Whitfield asserted the claim in state court, the claim (which finds no support in the record) lacks merit. Similarly, Whitfield's due-process claim based on the State Attorney's mentioning a "travesty of justice" lacks merit.

- 8 -

correct, and a petitioner must show "clear and convincing evidence" to rebut that presumption.

When a state court denies relief based on the conclusion that the petitioner failed to show deficient performance, the federal judiciary reviews the state-court decision through the "doubly deferential" lens of Section 2254 and *Strickland*. In other words, success on an ineffective-assistance claim in this circumstance requires showing that the state court unreasonably applied, or ruled contrary to, clearly established federal law in finding no performance outside the "wide range of reasonable professional assistance." This "doubly deferential" review "gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

According to Whitfield, the trial counsel performed deficiently by stipulating that the bullet entered at the "anterior aspect of the chest" and exited "on the right lower side" of Tatum's back.[6] Whitfield complains for several reasons about trial counsel's stipulating to the location of Tatum's wounds. First, Whitfield contends that the stipulation "served as the functional equivalent of a guilty plea." (Doc. 4 at 14) Rejecting this argument, the trial court (correctly) explained that a stipulation

---

[6] The stipulation, which the trial judge read to the jury, provides in full: Dr. Mesidor, emergency physician at Bayfront Medical Center treated Daniel Tatum for a gunshot wound on November 8, 2006. Dr. Mesidor found that the patient presented two gunshot wounds, one entry at the anterior aspect of the chest at the seventh intercostal space anteriorly below the nipple line and there was presumed exit laterally along the posterior axillary line. In other words, the entry would was located just below the left nipple, and the bullet traveled laterally, exiting on the right lower side of his back. These wounds were consistent with the patient turning his body as he was shot. (Vol. II at 241)

- 9 -

amounts to a guilty plea only if the stipulation establishes every element of a crime. (Vol. II at 234) The trial court neither unreasonably applied nor ruled contrary to clearly established federal law in rejecting Whitfield's argument that the stipulation, which says nothing about the identity of the shooter or the shooter's intent, amounted in effect to a guilty plea.

Second, Whitfield contends that trial counsel performed deficiently by entering into the stipulation because the stipulation "was highly prejudicial and patently false." Based on the location of the injury, Whitfield insists that Tatum must have seen the shooter and that Tatum's testimony at trial — that he never saw Whitfield pull the trigger — proves Whitfield's innocence and Tatum's deceit. The state court rejected Whitfield's argument:

> The Defendant's reliance on the exploratory operation report as proof that the aforementioned stipulation was "patently false" is misplaced. The exploratory operation report was merely a search of the victim's abdomen for the purpose of determining the extent of any interior damage caused by the bullet which entered the victim's chest. Indeed, the report explicitly provides that the bullet entered the 'anterior aspect of the chest cavity,' but that it penetrated the abdomen instead of the victim's chest. These facts would be consistent with the victim turning his body as he was shot. Nevertheless, regardless of that conclusion, the stipulation was not 'patently false' as it restated the information from the report: the bullet entered at the 'anterior aspect of the chest.'

(Vol. II at 235) Neither contrary to, nor an unreasonable application of, clearly established federal law, the state court's resolution of this claim admits of no plausible attack under Section 2254.[7]

---

[7] To the extent the Whitfield claims that the stipulation of facts violated Whitfield's Sixth Amendment right to confront the treating physician, the claim lacks merit. The parties stipulated to
(continued...)

**THE JUROR**

Finally, Whitfield claims ineffective assistance of counsel based on trial counsel's failure to "properly investigate juror misconduct" and to move for a mistrial.[8] Whitfield alleges (Doc. 4 at 18) that trial counsel performed deficiently by not moving to strike a juror, Tammy Edwards, after learning that Edwards "knew the petitioner and his family."

During *voir dire*, the trial judge asked whether any juror knew the defendant or the defendant's family, and Edwards did not raise her hand. (Tr. Trans. at 22) Whitfield claims that he informed trial counsel during *voir dire* that he knew Edwards. (An April 2013 evidentiary hearing on this ineffective-assistance claim revealed later that Edwards worked in the same office as Whitfield's aunt, Toni Dutrevil, who raised Whitfield.) Trial counsel declined to strike Edwards and offered no objection or argument about Edwards. (Tr. Trans. at 145)

In a Rule 3.850 motion in state court, Whitfield claimed ineffective assistance of counsel based on trial counsel's failure to move to strike Edwards during jury selection or to move for a mistrial. At an April 4, 2013 evidentiary hearing on this claim, three witnesses testified: Dutrevil, Whitfield, and Franklin Roberts, Whitfield's trial counsel. Roberts testified that his recollection of the trial depended

---

[7](...continued)
three facts and not to the admissibility of the physician's report. In accord with the parties' agreement, the presiding judge read the stipulation to the jury, but the record contains no evidence (and Whitfield submits no argument) that the jury received the physician's report.

[8] Whitfield asserts no claim about appellate counsel's performance, and Whitfield raised no claim in state court about appellate counsel's performance.

"for the most part . . . on the file." (Vol. II at 331) Roberts confirmed at the evidentiary hearing that he knew about the "juror issue" before the October 3, 2007 sentencing because his records contained a September 13, 2007 memorandum from an investigator. Asked when he learned about the "issue" with Edwards, Roberts testified that he lacked an "independent recollection" of the timing, but Roberts doubted that Whitfield mentioned the connection to Edwards during *voir dire*. (Vol. II at 343)

Dated two weeks after the conclusion of the trial, the memorandum documented an investigator's post-trial discussions with Edwards and the aunt, Toni Dutrevil. According to the memorandum, Dutrevil told the investigator that she "had been to see" Edwards the evening of the first trial day. Dutrevil reportedly told Edwards, "I know you can't talk about the case" before telling Edwards that Whitfield "was [Dutrevil's] nephew." According to the memorandum, Dutrevil told the investigator that Edwards questioned the sufficiency of the evidence. Dutrevil claimed, for example, that Edwards said, "There's not enough evidence to convict Kenneth." (Vol. II at 336)

According to the memorandum, the investigator interviewed Edwards, who confirmed that Dutrevil visited her house during the trial. Edwards reportedly told the investigator that, at the time she was selected as a juror, "she had no earthly idea who [Whitfield] was or . . . what family he belonged to." Edwards told the investigator that she saw Dutrevil in the courtroom on the first day of the trial but

that she drew no connection between Dutrevil and Whitfield because of their different last names. Edwards reportedly told the investigator that she repeatedly refused to speak with Dutrevil about the trial, and Edwards denied making the statements that Dutrevil attributed to Edwards. Roberts testified that, to his knowledge, Edwards never mentioned the incident to the bailiff, to the judge, or to the attorneys. (Vol. II at 338) Edwards reportedly told the investigator that she decided Whitfield's guilt based solely on the evidence and testimony adduced at trial.

No testimony or evidence suggests that Roberts learned about the incident during the trial, but Roberts admittedly learned about the incident before sentencing. Roberts testified that he declined to mention the incident to the presiding judge at sentencing because of a concern that "this was jury tampering on the part of Ms. Dutrevil." (Vol. II at 339) At another moment in the hearing, Roberts stated that he feared the "appear[ance] [that] the Defense was trying to influence the jury. The defendant through his family was trying to influence [the jury]." (Vol. II at 345)

Also, Roberts testified that he declined to mention the "juror issue" to the presiding judge because "A, [Edwards] didn't know my client and, B, it had no influence on her verdict." (Vol. II at 339) Although conceding that "in retrospect . . . maybe I would do it differently today," Roberts concluded, "[T]he information that Ms. Edwards gave us suggested that her verdict was not influenced by" the incident or her connection to Whitfield's aunt. (Vol. II at 346)

Dutrevil testified that she knew Edwards well and that the two occasionally "socialize[d] in the break room." (Vol. II at 350) The two sometimes talked about their children. Asked whether she talked to Edwards about Whitfield's "legal problems" (before the attempted-murder charge, Whitfield was convicted of carjacking), Dutrevil said, "Yes, I have talked to Tammy, but it was – yes. I'll let you answer – because I'm trying to make the connection to tell you how we was talking." (Vol. II at 351) Asked to clarify that answer, she said:

> From time to time I would ask Tammy about her son, which is Horme Henry. And the reason why I would ask for about him is because I have a great concern for kids, and I know him. So that's how our conversation started. And I would ask her quite often about Horme, and then I would mention my nephew [Whitfield].

(Vol. II at 352)

Dutrevil testified that she contacted Edwards during the trial "because I knew that she knew my nephew." (Vol. II at 352) Dutrevil testified that she left a message with Roberts's secretary about the juror during the trial, but Dutrevil could not recall whether she spoke with Roberts during the trial. (Vol. II at 354–55) Also, Dutrevil testified that she visited Whitfield at the jail during the trial and "probably" talked to him. (Vol. II at 358)

Whitfield testified that he recognized Edwards during *voir dire* and that he told Roberts once that he knew Edwards. (Vol. II at 360 and 362–63) Whitfield never mentioned anything about Edwards during the sentencing or to Whitfield's appellate counsel. (Vol. II at 363–64)

Denying the Rule 3.850 motion, the state court found Whitfield's testimony "not credible" and afforded the testimony "little weight." (Vol. II at 262) Affording the trial counsel's performance the deference commanded by *Strickland*, the state court concluded that Whitfield failed to show deficient performance. The state court reasoned:

> Pursuant to the testimony at the hearing, Mr. Roberts did not discover the juror issue until the end of the trial or after the trial had already been completed. It is clear that upon learning of this issue, Mr. Roberts conducted an investigation and concluded that Defendant had not been prejudiced. For this reason, Mr. Roberts made the strategic decision not to raise the issue before the Court, because he was afraid that Ms. Dutrevil's actions would reflect poorly on Defendant. Although Mr. Roberts indicated that in retrospect he might do things differently, this Court does not evaluate Mr. Roberts' conduct in retrospect. Instead, the Court concludes that at the time of the decision, Mr. Roberts performed as he believed to be in the best interest of his client.

(Vol. II at 262)

Mindful of the deference prescribed by Section 2254, this order concludes that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law as announced by the Supreme Court. Also, the state court's decision relies on a reasonable determination of the facts in light of the evidence adduced at the hearing. The state court accepted Roberts's testimony and rejected Whitfield's testimony that Whitfield told Roberts about Edwards during *voir dire*.[9] The finding that Roberts learned about Whitfield's connection to Edwards after

---

[9] To the extent Whitfield protests the reasonableness of the state court's crediting Roberts's testimony and discrediting Whitfield's testimony, those factual findings appear reasonable in light of the evidence at the hearing. For example, Whitfield testified — but Roberts "tend[ed] to doubt" —
(continued...)

*voir dire* is presumed correct, and Whitfield fails to show "clear and convincing evidence" to refute that presumption. The state court reasonably concluded that Roberts could not have moved to strike Edwards and could not have moved for a mistrial based on information not known (and about which Roberts had no reason to know) during the trial.[10]

To the extent Whitfield claims ineffective assistance of trial counsel based on the failure to move for a mistrial after learning about Dutrevil's contact with Edwards, no evidence in the state-court record shows that Roberts learned about the incident during the trial. On the contrary, the date of the memorandum suggests that Roberts learned about the incident no sooner than two weeks after the trial.[11] In any event, the state court reasonably concluded that trial counsel — who testified to an eminently reasonable fear that the incident might suggest jury tampering by the defense — performed within the "wide range of reasonable professional assistance"

---

[9](...continued)
that Whitfield told Roberts about the juror during voir dire. Roberts, who testified that he ordinarily notes an atypical circumstance about a juror, said that his notes remained silent about Edwards. Other statements by Whitfield rendered Whitfield's testimony suspect, including Whitfield's testimony that he mentioned knowing Edwards just once to Roberts and never to the sentencing judge or to appellate counsel. And the state court's factual findings relied on the state court's perception of the witnesses' demeanor.

[10] Whitfield testified that he mentioned once — during *voir dire* — his knowing Edwards, and as explained elsewhere in this order, the state court reasonably discredited Whitfield's testimony. Nothing in the state-court record suggests that Roberts learned about Edwards at another time during the trial.

[11] Although Whitfield's Rule 3.850 motion neither mentioned the Dutrevil incident nor asserted that counsel acted deficiently in failing to move for a mistrial based on the incident, the State never objected during the evidentiary hearing to Dutrevil's testimony or to defense counsel's argument about Dutrevil. The state court apparently adjudicated the merits of an ineffective-assistance claim based on trial counsel's not moving for a mistrial because of the incident.

in this circumstance. As the trial court reasonably observed, the trial counsel reasonably concluded that the incident, which followed Dutrevil's visiting Whitfield in jail, might have resulted in an increased sentence or a prospective charge of jury tampering. Additionally, in the interview Edwards told Roberts' investigator that her decision relied only on the evidence and testimony adduced at trial.

## CONCLUSION

Whitfield's petition (Doc. 4) for a writ of habeas corpus is **DENIED**. Because reasonable jurists could not debate the disposition of the petition, a certificate of appealability is **DENIED**. The clerk is directed (1) to enter judgment for the respondents and against Kenneth C. Whitfield and (2) to close the case.

ORDERED in Tampa, Florida, on July 26, 2018.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE